J-S50029-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN THE INTEREST OF: A.I.E.-M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.P., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 644 WDA 2019 |

Appeal from the Order Dated March 15, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000219-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: A.E.-M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.P., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 645 WDA 2019 |

Appeal from the Order Dated March 15, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000089-2018

BEFORE:   LAZARUS, J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY MURRAY, J.:                    FILED NOVEMBER 08, 2019

In these consolidated appeals, M.P. (Mother) appeals from the orders involuntarily terminating her parental rights to her minor children, A.E.-M. (born June 2010) and A.I.E.-M. (born July 2016) (Children) pursuant to 23

_____

[*] Retired Senior Judge assigned to the Superior Court.

Pa.C.S.A § 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act.[1] After careful review, we affirm.

The family first came to the attention of Allegheny County Office of Children, Youth and Families (CYF) on August 1, 2014, due to issues concerning medical neglect, domestic violence, substance abuse, and mental health. On August 8, 2014, A.E.-M. was removed from the home following a pediatrician's visit during which his sibling, N.E.-M.,[2] had lost so much weight that he was admitted to the hospital with a diagnosis of failure to thrive. At that time, Father was found to be in possession of a prescription bottle which had been filled for 60 pills on July 24, 2014, but had only 16 pills remaining. Upon leaving the appointment, Father was upset and punched the door. Mother was not present because she was hospitalized in a coma, reportedly due to domestic violence.

At a shelter care hearing on August 11, 2014, the court appointed Susan Abramowich, Esquire, as guardian ad litem. On September 24, 2014, following a hearing, A.E.-M. was adjudicated dependent. A.E.-M. was placed with foster parents, who wish to adopt him. A.I.E.-M., who was born in August 2016, was removed from the parties' care at birth and adjudicated dependent.

---

[1] That same day, the court terminated the parental rights of M.E.-M. (Father). Father has appealed the termination of his parental rights and we have issued a separate memorandum disposing of Father's appeal.

[2] Mother's and Father's parental rights to N.E.-M. were involuntarily terminated in January 2018, and he was adopted in September 2018. See N.T., 3/15/19, at 5.

A.I.E.-M. was eventually placed with his paternal aunt, H.E.-M., who wishes to adopt him. Permanency review hearings were held in December 2014, April 2015, July 2015, December 2015, March 2016, August 2016, January 2017, April 2017, August 2017, October 2017, and February 2018. In February 2018, the court entered an aggravated circumstances order against Mother because her parental rights to another child, N.E.-M., had been terminated.

In December 2017, CYF filed a petition to involuntarily terminate Mother's parental rights to A.I.E.-M; in April 2018, CYF filed a petition seeking to involuntarily terminate Mother's parental rights to A.E.-M. Further permanency review hearings were held in May 2018 and October 2018.

On March 22, 2019, following hearings on May 30, 2018, February 1, 2019, and March 15, 2019, the court terminated Mother's parental rights. Mother timely filed notices of appeal and statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother raises the following issues for our review:

1. Did the trial court abuse its discretion and/or err as a matter of law in concluding that termination of [Mother's] parental rights would serve the needs and welfare of [Children] pursuant to 23 Pa.C.S. § 2511(b)?

2. Did the trial court abuse its discretion and/or err as a matter of law in its failure to require counsel for the children to represent their legal interests per the mandates of the Supreme Court of Pennsylvania's decision in In re: L.B.M., 161 A.3d 172 (Pa. 2017) and its progeny; thus denying the children their rights to counsel and due process of law?

Mother's Brief at 8.

- 3 -

We review cases involving the termination of parental rights according to the following standard:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotations omitted).

Instantly, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). We have long held that in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc).

Mother concedes that CYF clearly and convincingly established threshold grounds for termination pursuant to subsection (a)(2). See Mother's Brief at 20. However, in challenging subsection (b), Mother argues that the trial court erred in examining the history of domestic violence between Mother and Father (Parents), their lack of progress in their goals, and the findings of Dr. Patricia Pepe regarding Children's relationships with both Parents and foster parents. Id. at 24-25. Mother contends that this analysis was "fault based"

and "comparative," and did not account for Children's needs and welfare because it did not examine the effect termination would have on Children.  Id.

Subsection (b) of 23 Pa.C.S.A. § 2511 provides:

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

We consider whether Children's needs and welfare will be met by termination pursuant to subsection (b).  See Z.P., 994 A.2d at 1121.  "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship."  Id.  The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well. Id.  Ultimately, the concern is the needs and welfare of a child.  Id.

We have stated:

Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension.  Continuity of the relationships is also important to a child, for whom severance of close parental ties is usually extremely painful.  The trial court, in considering what situation would best serve the child[ren]'s needs and

welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

Z.P., 994 A.2d at 1121 (quoting In re C.S., 761 A.2d 1197, 1202 (Pa. Super. 2000)). The trial court may equally emphasize the safety needs of the child and may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. See In re N.A.M., 33 A.3d 95, 103 (Pa. Super. 2011). Where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists and "[t]he extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." Id. "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." In re B.,N.M., 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

The record in this case is extensive. We begin with the testimony of CYF caseworker Kaitlyn Leo, who chronicled the history of the case, observing that the Agency became involved with the family in June 2014 due to issues of domestic violence, concerns regarding substance abuse by both Parents, and concerns regarding the health and care of Children. See N.T., 2/1/19, at 140-48. Ultimately, after Children were taken into emergency custody, they were adjudicated dependent. Id. During this time, Mother obtained a protection from abuse (PFA) order against Father following domestic violence

incidents that resulted in Father being criminally charged and convicted. Id. at 149-58.

With regard to placements, A.E.-M. was placed in a shelter home in August 2014; a kinship placement from August 2014 through November 2014; another foster home from November 2014 through January 2018; and from January 2018 through the present with T.K. and J.G., who are adoptive resources. Id. at 151. A.I.E.-M. was taken into custody and adjudicated dependent in August 2016, and was placed in a foster home until January 2017, when he was placed with his paternal aunt, H.E.-M. Id. at 152-54. An additional sibling, M.E.-M., was born January 2018, adjudicated dependent, and placed in the same foster home as A.E.-M. Id. at 154.

At the May 2018 hearing, Ms. Leo testified that A.I.E.-M. has Duane syndrome[3] and receives developmental therapy, physical therapy, and occupational therapy once per week. See N.T., 5/30/18, at 7. A.E.-M. is on the autism spectrum and has significant developmental delays. Id. at 8. A.E.-M. is doing extremely well in his current placement and has made "significant strides" during the review period. Id. at 9. He receives speech therapy, occupational therapy, physical therapy, and wraparound services. Id. at 9-

---

[3] Duane Syndrome is a rare eye disorder where the muscles and nerves around the eye do not develop properly during pregnancy. See WEBMD (Oct. 25, 2019, 12:22 PM), https://www.webmd.com/eye-health/duane-syndrome-facts#1. As a result, the eye muscles do not work in harmony, and prevent the eye from moving as it should. Id.

10. A.E.-M. is in pre-adoptive foster care with an additional sibling, Ma.E.-M. Id. at 8. Children have staggered visiting schedules with Parents, with one hour of overlapping time. Id. at 13-14. Since visitation coaching was implemented on March 13, 2018, there were twelve possible visits.[4] Id. at 14.

Ms. Leo testified that during the course of the proceedings, CYF scheduled approximately 14 family plan conferences with the family. See N.T., 3/15/19, at 6. Mother attended seven of the meetings in person and one by phone. Id. Mother's goals were: attend supervised visitation; obtain domestic violence treatment; obtain drug and alcohol evaluation and suboxone treatment; document compliance of participation in all programs; submit random urine screens; obtain mental health evaluation and treatment; complete a neuropsychological assessment; attend and participate in Children's medical appointments; and work with in-home services. See N.T., 5/30/18, at 16-17; N.T., 3/15/19, at 6-7.

Ms. Leo testified that Children were brought into care at the time Mother was in a coma due to domestic violence, and there was a second physical domestic violence incident in September 2014 that resulted in Mother's hospitalization with serious injuries. See N.T., 3/15/19, at 8. Criminal charges were filed as a result of the second incident; Father was convicted of simple assault. Id. at 8-9. Both Parents were asked to participate in domestic

_____

[4] It was unclear from Ms. Leo's testimony how many visits with Children Mother attended.

violence programs; Mother was to attend treatment at the Women's Center and Shelter. Id. Mother had some initial engagement with the Women's Center in 2014, but had little involvement in 2015 and 2016. Id. at 10. Toward the end of 2016 and early 2017, Mother reported that she was attending marriage counseling through Mercy Behavioral Health, though she never received documentation of her participation, consistency, or completion of that program. Id. Mother attended one session at the Women's Center in 2017 and one session at Turtle Creek. Id. at 11. Mother re-engaged with the Women's Center in April 2018 and has been mostly engaged since that date. Id. at 11. Mother has continually minimized the domestic violence issues with Father and denied that some of her injuries were the result of domestic violence. Id. at 13. While she admitted that at one point she had a bag packed in case she needed to flee, she has often addressed her plans regarding re-engaging in treatment, and stated that domestic violence does not need to be addressed. Id. at 13-14. CYF had ongoing concerns regarding Father's controlling and violent nature. Id. at 14.

With regard to Mother's drug and alcohol issues, Mother has a history of opioid and benzodiazepine abuse. Id. at 17. N.E.-M., A.I.E.-M., and M.E.-M. were all born with Subutex in their systems; Mother reported that her prescription for Subutex was for pain management after a car accident. Id. However, Mother has a diagnosis related to her opioid dependency, and attends medically assisted treatment at Accessible Recovery Services, though she did not provide signed releases prior to April 2017. Id. at 17-18. Mother

consistently tested positive for Subutex during drug screens, but not for other substances. See N.T., 5/30/18, at 16-17; N.T., 3/15/19, at 19. The screens were not random because, due to her work, Mother had to schedule her availability. See N.T., 3/15/19, at 19. Regardless, Mother was inconsistent in attending screens throughout the case and attended only 40% of the screens. Id. at 20. She became more consistent towards the end of 2018 through the date of the hearing. Id. Mother began engaging in dual diagnosis treatment at Turtle Creek in the beginning of 2017, but was not consistent with her attendance in that program. Id. Initially, Mother was required to attend weekly sessions, but she did not do so, and was moved to biweekly sessions with the goal of attending weekly sessions; Mother did not provide documentation that she increased to weekly sessions. Id. at 20-21. Also, Mother failed to complete a drug and alcohol treatment program. Id. at 22.

With regard to the neurological assessment, Mother attended the first part in December 2017. Id. at 30. It was recommended that Mother attend the second portion, but she did not provide documentation that she did so. Id.

With regard to parenting, Mother's goals were to implement proper nutrition for Children based upon their developmental age and dietary restrictions; engage in activities that promoted a bond with Children; address A.E.-M.'s special needs; and provide supervision and plan for Children during visits. Id. at 35-36. Mother attended the Arsenal parenting program from 2014 through 2016. Id. at 31-32. Services at Arsenal were "closed out" in

January 2016. Id. at 32. However, at that time, CYF still had significant concerns about Mother's parenting, and referred Mother to a second parenting program through Three Rivers Adoption Council. Id. at 33. Mother attended that program from January 2016 through July 2017, but did not complete it. Id. In July 2017, services were "closed out" because both Parents refused to attend. Id. at 34. Notably, both Parents had had in-home services since October 2016, and those services increased parenting education and provided parenting support during supervised visits until March 2018. Id. At that time, Parents had not made significant progress in their goals and a more intensive program was offered and visitation coaching implemented. Id.

Ms. Leo last observed Mother with Children in October 2018. Id. at 36. She opined that Mother loved Children and was affectionate toward them, but Ms. Leo remained concerned that Mother could not supervise all of her children at one time, and was not adhering to Children's dietary restrictions. Id. For example, Mother continued to offer A.I.E.-M. dairy products despite his dairy allergy which had been discussed on multiple occasions. Id. at 36-37. Additionally, Mother did not recognize the appropriate developmental stage for Children; she placed A.I.E.-M. on stairs and walked away, and on a counter while not buckled into a seat. Id. at 37. Mother did not appear to have an understanding of A.E.-M.'s specific needs and was not able to calm him without the utilization of electronics. Id. at 37.

Further, Mother has never consistently participated in educational or medical appointments for Children. Id. at 42. In 2017, Ms. Leo created an

email chain to give Parents daily updates about A.E.-M.'s education. Id. Despite these updates, Mother was unaware of A.E.-M.'s needs and was not able to contribute to the conversation in her sporadic attendance. Id. at 43. Mother has never consistently attended medical appointments, although she attended slightly more than Father. Id. Since 2014, Mother attended approximately five appointments. Id. at 44. As a result of both Parents' lack of participation, foster parents were granted full medical and educational decision making for both A.I.E.-M. and A.E.-M, effective October 2018. Id. at 45.

Ms. Leo additionally noted that both Children were flourishing in their foster placements and had made significant progress in their personal development, and were bonded to their foster parents. Id. at 52-53.

T.K., A.E.-M.'s foster mother, testified that she has been A.E.-M.'s foster mother since January 2018. See N.T., 2/1/19, at 9. A.E.-M. is doing very well at his current school. See N.T., 5/30/18, at 41. He recently received an assisted communication device and is learning to use it. Id. at 42. T.K. expressed concern that A.E.-M. returns from visits with Parents smelling like smoke, and that after one visit he started to "gag himself." Id. at 43. During the February hearing, T.K. testified that when A.E.-M. was first placed in her home, he was only partially toilet trained and was very underweight. See N.T., 2/1/19, at 11.

Since placement in T.K.'s home, A.E.-M. talks more and communicates more easily, does not "melt down" as often, and is completely toilet trained.

Id. at 12. He enjoys assisting T.K. in caring for his little brother, N.E.-M., who is also placed in the home. Id. A.E.-M. has stopped throwing violent tantrums where he injures himself. Id. at 13. A.E.-M. is very affectionate with his foster family and is responsive to being touched. Id. Although A.E.-M. has medical issues that require further medical intervention, including phlagiocephaly and a submucous cleft palate, his foster parents are ensuring that he receives the monitoring and care he requires. Id. at 16-17.

T.K. testified that she and her husband make sure that A.E.-M. attends all required medical and school appointments. Id. at 20. She notifies Mother of the appointments by email, but Mother has attended only nine appointments of 26. Id. at 20-21. A.E.-M.'s visitation with Mother was reduced to two hours a week, and sometimes he would become violent, despondent, or distant following visits. Id. at 24. T.K. described visits as "chaotic" and observed "a couple" of times where A.E.-M. had melt downs and hit both Parents. Id. at 26. T.K. testified that she loves A.E.-M. and that he is strongly bonded with his younger sibling, N.E.-M., also placed in T.K.'s home. Id. at 29.

H.E.-M., Children's paternal aunt and the kinship placement for A.I.E.-M. since January 2017, also testified. See N.T., 2/1/19, at 31. She has cared for A.I.E.-M. since he was four months old; at the time of the February 2019 hearing he was two and a half. Id. at 32. H.E.-M. testified that A.I.E.-M. is outgoing, talkative, sweet and loving, and is sensitive to feelings and emotions. Id. at 43-44. He interacts well with H.E.-M.'s daughter, his cousin.

Id. After visits with Parents, A.I.E.-M. "shuts down," is exhausted and often sick, and does not communicate. Id. at 44.

H.E.-M. described A.I.E.-M.'s special needs, which include feet braces, a helmet, tubes in his ears, and physical, occupational, and developmental therapy. Id. at 32. The helmet was required to treat his plagiocephay. Id. at 32-33. Although the helmet was to come off only during bathing and to be washed, A.I.E.-M. would often return from visits with Parents with the helmet on incorrectly. Id. at 34. Also, A.I.E.-M. would return from visits with Parents with his foot braces on incorrectly. Id. at 35. As noted, A.I.E.-M. has Duane syndrome and a wide range of food-related allergies, including dairy and sweet potatoes, as well as sensitivities to corn and beans. Id. at 37-38. H.E.-M. testified that Mother did not attend the majority of A.I.E.-M.'s medical appointments, while H.E.-M. attended every appointment that did not occur when A.I.E.-M. was at daycare. Id. at 40. The only medical appointment Mother attended was the surgery to place tubes in A.I.E.-M.'s ears. Id. at 43.

H.E.-M. testified that at the time of the February 2019 hearing, A.I.E.-M.'s visits with Mother had been reduced to twice a month. Id. at 40. When he returned, A.I.E.-M. was "very wild," does not want to listen or communicate, and is often ill, as though he ate food to which he has an intolerance. Id. at 40-41. H.E.-M. described this sickness as diarrhea, vomiting, and sometimes a rash. Id. at 41. H.E.-M. has attempted to speak to Mother about A.E.-M.'s allergies but has not seen any improvement. Id.

Patricia Pepe, Ph.D. a licensed psychologist who conducted individual and interactional evaluations of Parents, foster parents, and Children, testified. Id. at 49. Dr. Pepe stated that when she first began evaluating Mother in 2014, Mother was participating in domestic violence treatment. Id. at 53-54. Mother had not completed a drug and alcohol evaluation but was attending a suboxone clinic and group therapy. Id. at 53-54, 60. In 2014, Mother saw A.E.-M. two times in five months; during the visits, A.E.-M. exhibited problematic behavior such as not being verbal or toilet trained. Id. at 56. In Dr. Pepe's expert opinion, A.E.-M. had been traumatized by the domestic violence he had witnessed. Id. at 57.

Dr. Pepe expressed concern that Mother and Children would be in danger from Father due to his history of violent behavior, which included self-entitlement, lack of remorse, and complete denial and lack of accountability for his behaviors; Dr. Pepe was particularly concerned that Mother indicated a desire to stay with Father. Id. at 59. Dr. Pepe noted Mother's poor insight and recommended continued outpatient psychotherapy for Mother. Id. at 60. With regard to Mother's interactions with A.E.-M., during the evaluation in 2014, A.E.-M. ran to Mother and she was responsive to his "jumping" on her. Id. at 61. After prompting, Mother was able to identify the cause of A.E.-M.'s distress as thirst, and picked out appropriate toys for him. Id. at 62. There was emotional reciprocity and A.E.-M. seemed happy during the interaction. Id. at 62. However, his responsiveness to Mother was short lived due to his autism. Id. at 66.

During the August 2015 evaluation, Mother continued to be defensive about her history with Father, but admitted that Father had harmed her on multiple occasions. Id. at 64. However, Mother was no longer participating in domestic violence treatment, and Dr. Pepe had concerns regarding her drug and alcohol issues. Id. At that time, Dr. Pepe concluded that unless Mother made changes, her parenting capacity remained limited because Mother did not adequately address Children's needs. Id. at 64-65.

During Dr. Pepe's May 2016 evaluation, Mother was cooperative and expressed care and concern for Children. Id. at 66-67. She had recently returned to domestic violence counseling and admitted the extent of her issues. Id. However, she and Father were involved in couples counseling and in Dr. Pepe's view, Mother prioritized her relationship with Father over reunification. Id. at 67. Mother was still participating in a suboxone clinic. Id. Dr. Pepe recommended that Mother continue with outpatient psychotherapy and domestic violence counseling. Id.

During Dr. Pepe's November 2017 evaluation, A.E.-M. had made progress and seemed relaxed. Id. at 72-73. Mother generally exhibited adequate parenting, although Dr. Pepe had to intervene on occasion, as when Mother wanted to push A.E.-M. around the office in a rolling chair. Id. Also, Mother was inconsistent with participation in her treatments, and Dr. Pepe emphasized that she had to be fully cooperative with mental health, drug, and alcohol treatment if reunification was to occur. Id. at 73.

In February and August 2018, Dr. Pepe performed another evaluation of Mother. Id. at 74. At that point, Mother had been "in the system" for four years, and essentially the issues were the same. Id. at 74-75. Mother understood her goals of participating in domestic violence and mental health treatment and drug screens, but failed to follow through with the recommendations and goals. Id. at 75. In this evaluation, Mother's appearance was unusually disheveled and she seemed sedated: she was falling asleep, seemed confused, and had slurred speech. Id. at 75-76. Additionally, Mother exhibited antisocial personality disorder, both lying as a habit and possessing a sense of entitlement, and post-traumatic stress disorder. Id. at 77-78. At that time, Mother had the same goals, but had quit domestic violence counseling and had limited family or friend support. Id. at 79. Dr. Pepe stated that there were "a lot of psychological barriers" to reunification, that Mother was so egocentric that she could not "get out of her own skin" to see what was best for Children, and she was angry, resentful, and paranoid. Id. at 79-80.

Dr. Pepe also observed that Mother and Father would "work against each other" and compete for Children's attention. Id. at 82-83. Additionally, A.E.-M. became "out of control," rocking and throwing toys, and Mother was unable to intervene and help him. Id. at 86-87. During the evaluation, Mother left the room to use the restroom and returned smelling of cigarette smoke. Id. at 83. When asked if she could not have waited, Mother repeatedly denied

smoking. Id. at 83-84. When questioned further, Mother admitted her first instinct had been to lie. Id. at 84.

Dr. Pepe also evaluated H.E.-M., Children's paternal aunt and A.I.E.-M.'s foster parent. Id. at 70. In Dr. Pepe's opinion, H.E.-M. exhibited stability and a capacity for parental responsibility. Id. at 71. A.I.E.-M. formed a positive primary attachment with H.E.-M., and H.E.-M. interacted well with him. Id. at 90. At the time, A.I.E.-M. had successfully completed physical, occupational, and developmental therapy; he was in the average range in tests of his behavioral development. Id. at 91.

With regard to A.E.-M., he also showed a primary attachment to his foster placement and made great strides in his development: he was making eye contact, smiling, talking using multiple words, and was almost fully toilet trained. Id. at 92-94. His foster parents did an "excellent job" interacting with him using an instructional approach, and A.E.-M. was physically affectionate with them and told his foster Mother, "I love you." Id. at 92-93. In Dr. Pepe's opinion, A.E.-M. was almost an "entirely different child" than the one she observed interacting with Parents, where A.E.-M. made no attempt to speak to them or engage in physical affection. Id. at 93-94.

Dr. Pepe observed that Mother had not truly addressed the psychological issues that had led to issues with drug abuse, domestic violence, and overall instability. Id. at 96. Dr. Pepe opined that Children would not be harmed by the severance of a bond with Mother. Id. at 97. Specifically with A.E.-M., Dr. Pepe found permanency to be vital for continued growth and development,

stating that it was vital he remain in his current foster home. Id. at 99. Likewise, Dr. Pepe felt it was important for A.I.E.-M. to remain with his aunt, H.E.-M., where he had also made significant progress, going from developmental delays to exhibiting age appropriate functioning, and was very attached to his aunt. Id. at 99. In sum, Dr. Pepe opined it was in Children's best interests to be adopted. Id. at 99-100.

At the conclusion of the hearings, John A. Cavicchio III, Esquire, Children's legal counsel, put Children's position on the record. See N.T., 3/15/19, at 76. Specifically, he stated that A.I.E.-M., who was three at the time of the hearing, and A.E.-M., who was nine but had significant developmental delays, were not able to verbally express their preferences, and that there was no distinction between their best and legal interests. Id. at 77-78.

The trial court found it was in Children's best interests for Mother's rights to be terminated and for Children to be adopted. Although more relevant to subsection (a), the court noted continued domestic violence issues; Mother's inability to learn new parenting skills despite being referred to numerous parenting services; Mother's inability to safely supervise her children; Mother's inability to consistently attend Children's medical and educational appointments; Mother's inability to recognize the seriousness of Children's dietary restrictions and nutritional needs and prepare appropriate food for them; Mother's lack of participation in drug and alcohol treatment and inconsistency in attending screens. See Trial Court Opinion, 6/3/19, at 8-13.

More relevant to subsection (b), the trial court noted that Children had made great progress in their foster homes, and that for A.E.-M. particularly, stability and permanency were of utmost importance. Id. at 13-15. Dr. Pepe observed that A.E.-M. did not appear to have any level of attachment to Mother, and that he would not suffer any harm should the relationship with Mother be severed. Id. On the contrary, A.E.-M. would suffer harm if his relationship with his foster parents was severed. Id. Similarly, A.I.E.-M. is strongly bonded to his foster mother, H.E.-M., who successfully provided services and early interventions so that A.I.E.-M. is now developmentally appropriate. Id. at 15.

We see no error in the trial court's conclusion. As to subsection (b), concerning Children's needs and welfare and their bond with Mother, the record, though lengthy, contains little evidence of a bond, i.e., "an existing necessary and beneficial relationship" that would be "destroyed by termination" of Mother's parental rights. See Z.P., 994 A.2d at 1121. The testimony shows that A.I.E.-M.'s primary bond was with H.E.-M.; as to A.E.-M., the testimony shows he was not bonded with Parents and was not physically affectionate with them. On the contrary, he was strongly bonded with his foster parents and verbally expressed his affection for them. Even though there was evidence that Mother was affectionate and loving towards Children during visits, the focus of Section 2511(b) is not on Mother's bond with Children, but Children's bond with Mother. Id.

It is clear that Children's best interests are served by termination. A.E.-M. has been in care since 2014, and has made significant progress since being placed with his foster parents. From not being toilet trained, verbal, or able to interact appropriately, A.E.-M. is a happy, loving, affectionate child who has begun to speak and is fully toilet trained. Similarly, A.I.E.-M. has made significant progress since his placement with H.E.-M. While he required early intervention for medical and developmental issues, he is now developmentally appropriate for his age, and he has a strong and loving bond with his aunt. In contrast, Mother has not made progress towards being able to parent Children in all of the years of their placement, despite the assistance of numerous programs offered by CYF. Finally, we reiterate Dr. Pepe's testimony that in her expert opinion, it was in Children's best interests to be adopted and their bond with Mother severed. For the above reasons, we discern no abuse of discretion in the trial court's conclusion that Children's needs and welfare are best served by termination. See Z.P., 994 A.2d at 1126-27; K.Z.S., 946 A.2d at 763.

In her second issue, Mother argues that the court erred in its failure to require counsel for Children to represent their legal interests. See TCO at 16. This contention is not supported by case law.

The Pennsylvania Supreme Court, in In re Adoption of L.B.M., 161 A.3d 172, 183 (Pa. 2017) (plurality), held that 23 Pa.C.S.A. § 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in contested involuntary termination proceedings. The Court noted that legal

interests are synonymous with the child's preferred outcome, but the child's best interests are determined by the court. Id. The Pennsylvania Supreme Court held that: (1) a GAL may serve as counsel where there is no conflict between the child's legal and best interests, and (2) that there is no conflict between the child's best and legal interests if the child is non-communicative due to the child's young age. See In re T.S., 192 A.3d 1080, 1092-93 (Pa. 2018).

Here, A.E.-M. is severely autistic and for the most part, nonverbal; it was only recently that he began to speak. A.I.E.-M. was approximately three years old at the time of the hearings and was too young to verbally express his preferences. Counsel for Children noted on the record that Children were unable to verbally express their preferences, but that in his view, there was no distinction between their legal and best interests. See N.T., 3/15/19, at 76-78. Accordingly, the trial court did not err in accepting Counsel's representations. T.S., 192 A.3d at 1092-93.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/8/2019

- 22 -